FILED

IN THE UNITED STATES DISTRICT COURT MAR 16   AM 10: 54
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION     CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

| | |
|---|---|
| ALDORA ALUMINUM &  GLASS PRODUCTS, INC., ) | |
| ) | **CIVIL ACTION** |
| Plaintiff, ) | |
| ) | **Case No. 3:14-CV-1402-J-34JBT** |
| v.   ) | |
| ) | |
| POMA GLASS & SPECIALTY  WINDOWS, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## POMA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Poma Glass & Specialty Windows, Inc. ("Poma") moves this Court for judgment as a matter of law on all claims in Aldora Aluminum & Glass Products, Inc.'s ("Aldora") Amended Complaint.

### INTRODUCTION

This case arises from Aldora's and Poma's joint failure to reach acceptable agreements to transition Poma's lease of a glass fabrication facility in Jacksonville, Florida to Aldora. As a result, Aldora has asserted claims for breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel against Poma. These claims fail for a simple reason: the contract that Aldora seeks to enforce – the Memorandum of Understanding ("MOU") – is unenforceable as a matter of law.

The undisputed evidence is that Poma and Aldora negotiated the MOU as part of a two-part deal – the sale of certain pieces of equipment in the Jacksonville facility and the transition of Poma's lease of the facility to Aldora. The primary purpose of that two-part deal was the

transition of the lease because Aldora would not purchase the equipment if it could not also operate that equipment in the Jacksonville facility. It is for that reason that the MOU expressly conditioned the sale of the equipment on both Poma and Aldora individually reaching "acceptable agreements" with Poma's landlord to transition the lease. Despite the importance of the transition of the lease to the overall transaction, Poma and Aldora never discussed, much less agreed upon, the terms or even the broad parameters of the "acceptable agreements" prior to executing the MOU. Instead, open terms of the "acceptable agreements" were subject to future negotiation between the parties because each party's "acceptable agreement" with the landlord was dependent on the other party's agreement with the landlord – the more Aldora demanded from the landlord in lease concessions for a new lease, the more the landlord required from Poma for an early lease termination fee.

There can be no question that an essential term of the MOU – the transition of the lease of the Jacksonville facility – was never agreed to by the parties. For this reason, the MOU is an unenforceable agreement.

## FACTUAL BACKGROUND

### I.    Negotiation Of The MOU

Poma operated several glass fabrication facilities, including a facility located in Jacksonville, Florida (the "Jacksonville facility").[1] In 2014, Poma decided to shut down that facility.[2] As of October 2014, Poma was leasing the Jacksonville facility from 6600 Suemac

---

[1]    *See* Christopher Correnti Deposition dated October 26, 2015, attached hereto as Exhibit 2 ("Correnti Depo") at 34:13-16.

[2]    *Id.* at 49:5-13; 50:4-8.

Place LLC (the "Landlord")[3] and had 18 months remaining on its lease.[4]

In the summer of 2014, Leon Silverstein ("Silverstein"), the CEO of Aldora, reached out to the Landlord about renting the Jacksonville facility after Poma moved out.[5] Because Aldora, like Poma, intended to use the Jacksonville facility for glass fabrication, Aldora was also interested in purchasing certain pieces of Poma's equipment at the facility.[6] Aldora believed that an agreement on both the equipment and a lease would be a "win/win" because it was "a quick way for [Aldora] to be up and running."[7]

As a result, Silverstein and Christopher Correnti ("Correnti") of Poma began negotiating a two-part deal -- (1) an agreement on the sale of the equipment and (2) an agreement on the transition of the lease.[8] The deal necessarily involved two components because Aldora was not "just going to buy the equipment assets and not end up operating and leasing the building."[9] The parties therefore planned to first work out an agreement regarding the equipment and then "work out . . . individual deals with the landlord" regarding Poma's early lease termination and Aldora's new lease.[10]

---

[3]     Mr. Mac Easton was the representative of the Landlord that dealt with the parties. *See* August 19, 2014 Email from L. Silverstein to C. Correnti, attached hereto as Exhibit 8 ("Exhibit 8") at 2;  August 27, 2014 Email from L. Silverstein to M. Easton, attached hereto as Exhibit 9 ("Exhibit 9").

[4]     November 1, 1993 Lease Agreement, attached hereto as Exhibit 10 ("Exhibit 10") at 32.

[5]     Exhibit 8; *see also* Deposition of Leon Silverstein dated December 3, 2015, attached hereto as Exhibit 5 ("Silverstein Depo") at 55:3-56:9.

[6]     April 10, 2014 email from L. Silverstein to C. Correnti, attached hereto as Exhibit 11 ("Exhibit 11"); Exhibit 8; Silverstein Depo at 91:8-12.

[7]     Silverstein Depo at 100:2-8.

[8]     Exhibit 8; Silverstein Depo at 101:7-12.

[9]     Silverstein Depo at 100:22-101:6; 150:10-16.

[10]     August 25, 2014 Email from L. Silverstein to C. Correnti, attached hereto as Exhibit 12 ("Exhibit 12").

In early September of 2014, the parties ultimately agreed on a purchase price of $825,000 for the equipment.[11]  On September 4, 2014, the parties executed the MOU whereby Poma "agree[d] to sell to Aldora and Aldora agree[d] to purchase" certain assets listed in Exhibit A to the MOU for $825,000.[12]  Given that the purchase of the assets was only part of the transaction, Poma and Aldora expressly conditioned the sale on the parties reaching "acceptable agreements" with the Landlord regarding the transition of the lease.[13]  Specifically, Section 5.b of the MOU stated that the sale was subject to the following condition:

> Poma and Aldora individually working out acceptable agreements to transition the Jacksonville Site and provide a lease thereof to Aldora and allow Poma to exit the facility with the landlord for that site prior to the Closing.[14]

The closing date for the transaction was to occur on or before October 31, 2014.[15]

Despite this express condition precedent, Aldora and Poma never discussed, much less agreed upon, any terms or even broad parameters of the "acceptable agreements" before or after signing the MOU.[16]  Poma never discussed with Aldora how much Poma was willing to pay the Landlord to reach an "acceptable agreement" for an early termination of its lease.[17]  Similarly, Aldora never discussed with Poma the terms that Aldora would consider as an "acceptable agreement" for a lease of the Jacksonville facility, such as the amount of free rent at the start of the lease, the amount of any tenant improvement allowance to be paid by the Landlord, or even

---

[11]    August 30, 2014 Email from L. Silverstein to S. Hauncher, attached hereto as Exhibit 13 ("Exhibit 13") at 1.

[12]    September 5, 2014 Email from C. Correnti to L. Silverstein, attached hereto as Exhibit 14 ("Exhibit 14") at 3.

[13]    *Id.*

[14]    *Id.*

[15]    Poma later agreed to extend the closing date to November 7, 2014. *See* October 31, 2014 Email from C. Correnti to L. Silverstein, attached hereto as Exhibit 15 ("Exhibit 15") at 1-2.

[16]    Silverstein Depo at 180:14-18; 225:3-8; 230:16-231:1.

[17]    *Id.* at 180:14-18; 225:3-8.

the monthly lease rate.[18]  This was important because Poma never agreed to fund any free rent

or tenant improvement allowance or any other lease demand for Aldora.[19]

## II.    The Parties' Negotiations With the Landlord

On August 27, 2014, Aldora provided the Landlord with its proposed lease terms for the

Jacksonville facility so that the Landlord could "build [those] costs into whatever model [the

Landlord needed] to make in an early termination deal with [Poma]."[20]  Aldora demanded,

among other things: (1) a 10 year lease term; (2) $135,084 in free rent (six months free rent at

$22,514/month); and (3) a $150,000 tenant improvement allowance.[21]  Aldora then planned to

remain on the "sidelines" while Poma negotiated its agreement with the Landlord.[22]  This was

because Aldora wanted Poma to negotiate its early termination agreement first – with Aldora

negotiating second – because the early termination fee the Landlord obtained from Poma would

directly affect the lease terms the Landlord would give Aldora.[23]  The converse was also true –

what Aldora demanded in lease terms (*i.e.*, free rent and tenant improvement allowances) would

directly affect the amount of any early termination fee the Landlord would accept from Poma.[24]

On September 16, 2014, Poma offered the Landlord $38,000 for the early termination

of its lease.[25]  Poma emphasized that it was "not willing to pay additional funds to terminate

the lease" because (1) it brought Aldora to the Landlord and (2) it had agreed to a reduced

---

[18]    *Id.* at 181:12-19; 224:23-225:2.
[19]    *Id.* at 252:4-10.
[20]    Exhibit 9 at 2.
[21]    *Id.* at 3-4.
[22]    *See* September 16, 2014 Email from L. Silverstein to C. Correnti, attached hereto as Exhibit 16 ("Exhibit 16").
[23]    October 7, 2014 Email from L. Silverstein to C. Correnti, attached hereto as Exhibit 17 ("Exhibit 17"); Silverstein Depo at 81:2-11; 252:16-253:1; 274:22-275:9.
[24]    Silverstein Depo at 85:14-20.
[25]    September 16, 2014 Email from C. Correnti to M. Easton, attached hereto as Exhibit 18 ("Exhibit 18").

purchase price on the equipment in order to facilitate the lease transition.[26]  Poma suggested

that the Landlord "firm up [its] lease requirements and terms with Aldora" given that the two

agreements were directly dependent on one another.[27]  On that same day, Poma explained to

Aldora that the Landlord wanted "a lot more money from [Poma] to terminate [the] lease early

than [Poma was] willing to pay."[28]  In response, the Landlord suggested that Poma sublease

the facility to Aldora.[29]  Poma, however, was unwilling to enter into a sublease because its

"intent [was] to transition out completely with a full release from the lease."[30]

Poma subsequently increased its offer to $96,658.50[31] for the early termination.[32]  The

Landlord rejected this proposal as a "non-starte[r]" based on Aldora's proposed lease terms

because "Aldora's ask to us includes a [tenant improvement allowance] of $150,000, 6 months

[free rent] and a rate of 2.50 nnn, and we pay a broker to negotiate this."[33]  The Landlord did

not see how Poma could negotiate an agreement that would "bridge the gap" between what

Poma was willing to pay and what Aldora expected in lease concessions from the Landlord.[34]

The Landlord failed to make any counter to Poma's $96,658.50 offer.[35]  Poma later asked the

---

[26]     *Id.*

[27]     *Id.*; Silverstein Depo at 242:3-9.

[28]     September 17, 2014 Email from L. Silverstein to S. Hauncher, attached hereto as Exhibit 19 ("Exhibit 19") at 1.

[29]     September 30, 2014 Email from M. Easton to C. Correnti, attached hereto as Exhibit 20 ("Exhibit 20").

[30]     October 22, 2014 Email from C. Correnti to M. Easton, attached hereto as Exhibit 21 ("Exhibit 21") at 1.

[31]     This offer consisted of three components: (1) $38,658.50 to repair copper wire that had been stolen from the Jacksonville facility; (2) $31,000 to resolve insurance and past claims; and (3) $27,000 for the lease buyout. *Id.* Poma believed that $27,000 was a reasonable offer for the buyout since Aldora was going to lease the facility for "at least 32 months longer than" Poma and therefore any difference in the amount of rent that Poma was paying versus what Aldora was going to pay would be covered by the additional rental revenue the Landlord would receive from Aldora over the course of a long-term lease. *Id.*

[32]     *Id.*

[33]     October 29, 2014 email from M. Easton to C. Correnti, attached hereto as Exhibit 22 ("Exhibit 22").

[34]     *Id.*

[35]     *Id.*

Landlord for the amount it would accept for Poma's early lease termination.[36]  Poma once again emphasized that it was unwilling to fund Aldora's lease concessions – the free rent and tenant improvement allowances – because they were costs that the Landlord would get back from Aldora over the life of the new lease.[37]

On October 29, 2014, the Landlord finally gave Poma a number – $500,000.[38]  The number was based on, among other things, the difference between Poma's rent and the rent Aldora was willing to pay.[39]  Poma rejected that offer because it was "not willing to pay anywhere near $500,000 to get out of [the] lease early."[40]  Poma also reiterated that it was unwilling to fund any of Aldora's lease terms.[41]  (Of course, nowhere in the MOU did Poma agree to fund Aldora's free rent or tenant improvement allowance.)[42]  The Landlord, however, remained firm that he needed to recoup at least some of Aldora's lease demands ($135,000 free rent and $150,000 tenant improvement allowance) from Poma's early termination fee.[43]

Despite the dire status of the negotiations between Poma and the Landlord and the fact that the MOU was set to expire, Poma agreed to extend the closing of the MOU to November 7, 2014 to allow additional time for the parties to reach "acceptable agreements" with the Landlord.[44]  (Poma could have simply let the MOU expire on its own terms.)  By early

---

[36]   October 29, 2014 Email from M. Easton to C. Correnti, attached hereto as Exhibit 23 ("Exhibit 23") at 2.
[37]   *Id.*
[38]   *Id.*
[39]   *Id.* at 1.
[40]   October 29, 2014 Email from C. Correnti to M. Easton, attached hereto as Exhibit 24 ("Exhibit 24") at 1.
[41]   *Id.*; *see also* November 4, 2014 Email from M. Easton to C. Correnti, attached hereto as Exhibit 25 ("Exhibit 25").
[42]   Silverstein Depo at 252:4-10.
[43]   Exhibit 25.
[44]   Exhibit 15.

November, however, it became apparent to Poma that an agreement with the Landlord was not going to be reached because what the Landlord wanted Poma to pay versus what Poma thought it "should pay to get out of the lease [were] far apart."[45]  Poma explained that funding Aldora's lease demands would take "away the majority of the benefits [Poma] thought [it] could achieve in this proposed transaction."[46]  On November 5, 2014, Poma sent an email to the Landlord summarizing the current state of the negotiations.[47]  Poma explained that, in order to reach an agreement, several things needed to occur, including: (1) the Landlord needed to finalize the terms of its lease with Aldora; and (2) additional negotiations were necessary to finalize the amount of the early lease termination.[48]

Unable to ultimately bridge the gap between Poma's offer of $96,658.50 and the Landlord's demand of $500,000, Poma informed Aldora that Poma was unable to work out an "acceptable agreement" with the Landlord.[49]  On November 6, 2014 – the day before the extended closing date of the MOU – Poma emailed Aldora and stated that it had become apparent that the Landlord expected to get "all or at least a significant portion" of Aldora's $135,000 free rent and $150,000 tenant improvement allowance demand from Poma, but that Poma was "not going to be the banker for [Aldora's] proposal with the Landlord."[50]  Poma concluded by stating as follows:

> [W]e made what we believed was a fair offer to buy-out the lease and [the Landlord] reject[ed] it as a non-starter.  His counter was significantly higher than that and had no supporting basis other than the lease differential which

---

45  October 29, 2014 Email from C. Correnti to L. Silverstein, attached hereto as Exhibit 26 ("Exhibit 26") at 1.
46  November 7, 2014 Email from C. Correnti to L. Silverstein, attached hereto as Exhibit 27 ("Exhibit 27").
47  November 5, 2014 Email from C. Correnti to M. Easton, attached hereto as Exhibit 28 ("Exhibit 28").
48  *Id.*
49  Exhibit 27 at 1.
50  *Id.*

we now know includes the 5 (sic) months free rent and the capital improvement work and some additional unspecified monies for possible building repairs, electrical repairs and financial risks with the new lease. We are not willing to just negotiate between those numbers without some way to justify or have some logic to support that negotiation. So we do need more than knowing what our obligations are over the remainder of the lease term to get some agreement. We appreciate your willingness to buy the equipment without the rest of the deal being finalized and even take it if it is not finalized, but we are not willing to proceed on that basis. Selling just the equipment is not why we made this proposed deal. It had to accomplish all our purposes or we would just use the equipment at our other remaining sites and work on the lease mitigation in other ways either ourselves or together with [the Landlord]. Given where we are now and the timing and likelihood of getting to a number we would be willing to pay, that is why we concluded it is best not to extend the deal anymore so we both can move forward with other options.[51]

Notably, Aldora was also unable to reach an agreement on the terms of a lease with the Landlord.[52] As of November 6, 2014, the only draft lease that had been exchanged was a September 28, 2014 draft – a draft was subject to further negotiations.[53] The MOU thus expired on November 7, 2014 with the parties having been unable to reach "acceptable agreements" with the Landlord to transition the lease.[54]

Despite the expiration of the MOU, Silverstein later enlisted the help of Scott Hauncher ("Hauncher"), a member of Aldora's board, to continue the negotiations with Poma.[55] On November 12, 2014, Hauncher emailed Mike Antonucci ("Antonucci") of Poma explaining that the Landlord believed that its $500,000 offer was reasonable based on Poma's total

---

[51]     *Id.* at 1-2.
[52]     Silverstein Depo at 156:11-15.
[53]     September 28, 2014 Email from L. Silverstein to M. Easton, attached hereto as Exhibit 29 ("Exhibit 29").
[54]     Exhibit 27; Exhibit 15.
[55]     Silverstein Depo at 31:21-23; Leon Silverstein Deposition dated December 4, 2015, attached hereto as Exhibit 6 ("Silverstein Depo (Day 2)") at 30:2-15.

outstanding lease obligations.[56]  Hauncher explained that there appeared "to be a $400,000 difference between the $100,000 settlement amount [Poma] proposes, and the $500,000 [p]roposed by [the Landlord]."[57]  Nevertheless, Hauncher told Antonucci that Aldora was willing to "bridge some of this gap" by "reducing some of the rent and [tenant improvement allowance] concessions" in Aldora's demand to the Landlord.[58]

Aldora later decided that it "would pick up the difference of the delta between what . . . [the Landlord] . . . was going to get from [Poma], and the $500,000."[59]  On November 14, 2014, the same day that Aldora filed its Complaint, Hauncher emailed Poma and stated that Aldora had finally come to an agreement on lease terms with the Landlord and that the Landlord was willing to accept $98,658 for an early lease termination – the same amount that Poma had offered, and the Landlord had rejected, in October.[60]  The MOU had already expired and Poma was under no obligation to accept Aldora's offer and therefore did not accept it.[61]

### III.  Poma's Discussions with Trulite

In July of 2014, Poma's parent company, AGC Glass Company North America ("AGC"), began negotiating a transaction with Trulite Glass Company ("Trulite") for the purchase of AGC's North American commercial fabrication glass business.[62]  Pursuant to a Letter of Intent ("LOI"), AGC would sell certain of its glass fabrication facilities to Trulite.[63]

---

[56]    November 12, 2014 Email from M. Antonucci to C. Correnti, attached hereto as Exhibit 30 ("Exhibit 30") at 1.
[57]    *Id.*
[58]    *Id.*
[59]    Silverstein Depo (Day 2) at 50:9-14; 51:14-20.
[60]    Dkt. No. 1; November 14, 2014 Email from S. Hauncher to M. Antonucci, attached hereto as Exhibit 31 ("Exhibit 31") at 1.
[61]    Michael Antonucci Deposition dated August 25, 2014, attached hereto as Exhibit 1 ("Antonucci Depo") at 238:8-9; Exhibit 15.
[62]    Correnti Depo at 41:24-42:4; 65:12; 93:15-19.
[63]    *Id.* at 38:3-39:1; October 2, 2014 Letter of Intent, attached hereto as Exhibit 32 ("Exhibit 32").

The LOI covered only AGC's open facilities and therefore the Jacksonville facility was excluded from the transaction and not mentioned in the LOI.[64]

On October 27, 2014, Trulite, for the first time, indicated that it believed the Jacksonville facility was part of the transaction.[65]   Sun Capital, Trulite's parent company, "expressed that Jacksonville needed to be . . . part of the deal that [AGC was] in the middle of striking with [Trulite]."[66]   AGC responded with surprise because the Jacksonville facility and equipment were never part of the Trulite transaction.[67]   Given the status of Poma's negotiations with the Landlord on the early lease termination and the fact that an "acceptable agreement" with the Landlord was doubtful at that time, AGC and Trulite discussed a potential structure under which AGC could sell the Jacksonville equipment to Trulite if the MOU with Aldora did not close.[68]   As previously discussed, the MOU did not close on or before November 7, 2014.[69]   AGC and Trulite later signed a final agreement with regard to the Jacksonville equipment on December 29, 2014 – almost a month and a half after Poma was unable to reach an agreement with the Landlord regarding the transition of the Jacksonville lease.[70]

---

[64]      Correnti Depo at 38:3-5; 101:16-22; Paul Schmitz Deposition dated October 30, 2015, attached hereto as Exhibit 3 ("Schmitz Depo") at 44:11-45:4; 59:10-15; Exhibit 32.

[65]      Antonucci Depo at 33:16-34:11.

[66]      *Id.* at 150:14-19.

[67]      *Id.* at 34:5-11; 157:23-158:10.

[68]      *See* Correnti Depo at 302:15-303:2; Stephen d'Incelli Deposition dated November 16, 2015, attached hereto as Exhibit 4 ("d'Incelli Depo") at 383:21-385:1. Aldora will likely argue, as it did in its response to Poma's motion to compel (dkt. no. 80 at 3), that once Trulite learned that Poma intended to sell the equipment to Aldora, that Poma set out to "kill" the Jacksonville transaction with Aldora.  *See* October 29, 2014 Email from M. Antonucci to A. Wolfe, attached hereto as Exhibit 33 ("Exhibit 33").  The evidence, however, establishes that Poma continued to negotiate with the Landlord until the expiration of the MOU. Exhibit 24; Exhibit 26. Poma and Trulite did not sign an agreement on the equipment until more than a month after the expiration of the MOU. Correnti Depo at 302:6-11; Antonucci Depo at 230:14-22; d'Incelli Depo at 385:15-20.

[69]      Exhibit 15.

[70]      Correnti Depo at 302:6-11; Antonucci Depo at 230:14-22; d'Incelli Depo at 385:15-20.

## SUMMARY JUDGEMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *See Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593–94 (11th Cir.1995) (internal citations and quotation marks omitted).

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.      The Breach Of Contract Claim Fails Because The MOU Is An Unenforceable Agreement**

In order to establish a claim for breach of contract under Florida law, a plaintiff must demonstrate "(1) that a contract exists, (2) that the contract has been breached, and (3) that

some damage has occurred." *See Looney v. Protective Life Ins. Co.*, No. 8:07-CV-1020-T-17TBM, 2007 WL 2669190, at *3 (M.D. Fla. Sept. 6, 2007) (citing *Knowles v. C.I.T. Corp.*, 346 So.2d 1042 (Fla. 1st DCA 1977)).  To demonstrate that a valid contract exists, a plaintiff must establish sufficient specification of the essential terms of the agreement. *See, e.g.*, *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004).

"A meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract, and where it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting of the minds." *DeVaux v. Westwood Baptist Church*, 953 So.2d 677, 681 (Fla. 1st DCA 2007).  *Midtown Realty, Inc. v. Hussain*, 712 So.2d 1249, 1251 (Fla. 3d DCA 1998) (holding letter of intent was unenforceable contract).  "Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." *Dows v. Nike, Inc.*, 846 So.2d 595, 602 (Fla. 4th DCA 2003) (holding contract unenforceable because writing "evinced the parties' intent to take further action prior to completing the binding agreement"); *ABC Liquors, Inc. v. Centimark Corp.*, 967 So.3d 1053, 1056 (Fla. 5th DCA 2007).  Simply put, an "'agreement to agree' in the future" is unenforceable as a matter of law. *John Alden Life Ins. Co. v. Benefits Mgmt. Assocs., Inc.*, 675 So.2d 188, 189 (Fla. 3d DCA 1996) (contract stating that "separate bonus payment will be negotiated" held unenforceable as an "agreement to agree"); *Spanish Broad. Sys. of Fla., Inc. v. Alfonso*, 689 So.2d 1092, 1094 (Fla. 3d DCA 1997) (holding contract unenforceable as "agreement to agree").

In addition, "[t]hese [essential] terms must be expressed with reasonable certainty considering 'the subject matter of the agreement, the purposes for which it was entered into,

the situation and relation of the parties, and the circumstances under which it was made.'"
*Farrell v. Phillips*, 414 So.2d 1119 (Fla. 4th DCA 1982).   As the Florida Supreme Court
recognized, "[i]f the essential terms are so uncertain that there is no basis for deciding whether
the agreement has been kept or broken, there is no contract." *David v. Richman*, 568 So.2d
922, 924 (Fla. 1990) (quoting Restatement (Second) of Contracts, § 33, comment a (1981)).

The MOU is unenforceable as a matter of law because (1) the transition of the lease of
the Jacksonville facility was an essential term of the MOU and (2) the parties never agreed on
the terms of the transition of the lease.   As a result, Aldora's breach of contract claim fails as
a matter of law.

### A.    The Transition Of The Lease Was An Essential Term Of The MOU

Whether a provision of a contract constitutes an "essential term" will vary according to
the nature and complexity of each transaction and must be evaluated on a case specific
basis. *King v. Bray*, 867 So.2d 1224, 1228 (Fla. 5th DCA 2004); *ABC Liquors*, 967 So.2d at
1056.   Here, it is undisputed that the transition of the lease was an essential term of the MOU.

The transition of the lease was a primary purpose of the proposed transaction between
the parties.   This is evident by the MOU itself.   Per Section 5.b, the sale of the assets was
expressly conditioned on the transition of the lease.[71]   As Mr. Silverstein testified, it was "a
two-part deal."[72]   The parties intended to first reach an agreement on the purchase of the
equipment and then "work out . . . individual deals with the landlord" regarding Poma's early
termination of the lease and Aldora's new lease.[73]   There would have been no need for a two-

---

[71]    Exhibit 14 at 30.
[72]    Silverstein Depo at 101:7-12.
[73]    Exhibit 12 at 1; August 26, 2014 Email from L. Silverstein to S. Hauncher, attached hereto as Exhibit
34 ("Exhibit 34").

part deal if the MOU was solely a sale of assets.  Indeed, Mr. Silverstein testified that he "would

not have even pursued the MOU if [he] didn't think [he] could get a lease with Mac."[74]  This

was because Aldora was not simply "going to buy the equipment assets and not end up

operating and leasing the building."[75]  As Mr. Silverstein stated:

> Q.  So as of this time you understood that if you could agree with Poma on
> the terms of how much you would pay for the equipment, then the next
> step is Aldora would try to work out a lease with Mac and Poma would
> try to work out an early termination with Mac, is that right?
> **A.  Correct.**
> Q.  And that was all part of the transition of the Jacksonville facility from
> Poma to Aldora; right?
> **A.  That was the idea behind it.**
> Q.  And because getting Aldora into the Jacksonville facility was an integral
> part of what you were trying to do in connection with this deal with
> Poma; right?
> **A.  Yeah.  I mean yes.  Yes.**
> Q.  Because you weren't going to just buy the equipment without getting
> into the facility; right?
> **A.  Correct.**[76]

The same was true for Poma.  The transition of the lease was central to its transaction.  As Mr.

Correnti explained, "selling just the equipment is not why we made this proposed deal."[77]  Had

Aldora not been willing to take over the lease, Poma would have simply moved the

Jacksonville equipment to one of its other facilities.[78]

Moreover, the importance of the transition of the lease is evident from the fact that

Aldora's financial obligations associated with a proposed new lease far exceeded the purchase

price of the equipment.  Whereas the purchase price of the equipment was $825,000, a lease

---

[74]  Silverstein Depo at 152:6-8.
[75]  *Id.* at 150:10-16.
[76]  *Id.* at 100:9-101:6.
[77]  Exhibit 27 at 1.
[78]  *Id.*; Correnti Depo at 209: 8-18.

agreement for the Jacksonville facility would have resulted in a financial obligation greater than $2,600,000 for Aldora – a ten year term lease term at approximately $264,000 per year.[79] Furthermore, of the nearly $26,000,000 in alleged damages sought by Aldora – almost 32 times the equipment purchase price – nearly $22,500,000 relates to purported damages from the failure to transition the lease.[80]

### B.    The Parties Never Agreed On The Terms Of The Lease Transition

The undisputed evidence is that Poma and Aldora never agreed on – or even discussed – the terms of the transition of the lease at any point prior to executing the MOU.  Specifically, Poma never discussed with Aldora what Poma "was willing to pay the landlord for an early termination."[81]  Likewise, Aldora never discussed with Poma the terms that Aldora considered "acceptable" for a new lease.[82]

> Q.    Were the terms of the, quote, "acceptable agreements" ever discussed with Poma prior to signing the MOU?
> A.    **No.**
> Q.    Were the terms of the, quote, "acceptable agreements" ever put in any emails between Poma and Aldora prior to signing the MOU?
> . . .
> A.    **I don't believe so, no.**[83]

Simply put, Poma never agreed to pay any specific (or even general) amount to terminate the lease early, and Aldora never agreed to offer certain terms (such as a rental rate, free rent

---

[79]     Exhibit 9 at 3-4.
[80]     Aldora seeks nearly $26,000,000 in damages.  *See* Poma's Motion to Exclude Testimony of G. Hartley Mellish, at Exhibit A (expert report), filed contemporaneously herewith.  Of that amount, only $3,653,750 relates to the failure to purchase the equipment.  The remaining approximately $22,500,000 relates to damages arising from Aldora's failure to obtain a lease and operate at the Jacksonville facility.
[81]     Silverstein Depo at 180:14-18; 225:3-8; 225:19-24.
[82]     *Id.* at 179:23-180:7.
[83]     *Id.* at 230:16-231:1.

period, or amount of a tenant improvement allowance) for a lease of the Jacksonville facility.[84]

What is more, despite the fact that the parties' negotiations with the Landlord ultimately turned on whether Poma was willing to fund any of Aldora's lease concession demands (*i.e.*, free rent, tenant improvement allowance), Aldora and Poma never discussed the "subject of Poma funding any free rent or tenant allowance" prior to signing the MOU.[85]  Poma never agreed to fund any of Aldora's lease concession demands.[86]  Aldora never discussed with Poma whether Poma would fund any lease concessions.[87]

This failure to discuss and agree upon the terms of the transition of the lease renders the MOU unenforceable because the Landlord intended to recoup some portion of Aldora's lease demands through its early termination agreement with Poma, something Aldora was well aware of and Poma was unwilling to accept.[88]  Therefore, it is undisputed that the parties never discussed, much less agreed on, an essential term of the MOU – the transition of the lease of the Jacksonville facility.  This failure renders the MOU unenforceable as a matter of law because "[w]here essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." *Dows*, 846 So.2d at 602.  There was simply no meeting of the minds between the parties on the terms of the transition of the lease. *Midtown Realty*, 712 So.2d at 1251.

---

[84]    *Id.* at 180:14-18; 225:19-24; 251:18-22.
[85]    *Id.* at 251:23-252:10.
[86]    Exhibit 18 at 1.
[87]    Silverstein Depo at 251:18-252:3.
[88]    Exhibit 23; Exhibit 27; Silverstein Depo at 81:2-11 ("So you understood that in connection with this proposed transaction with Mac Easton that he would have to recoup some of the tenant allowance that you were requesting and some of the free rent that you were requesting from Poma in connection with their termination deal; right? Yeah.").

II.   **The Court's Prior Ruling On Poma's Motion to Dismiss Does Not Preclude Summary Judgment Because the Undisputed Evidence Establishes That The MOU Is Unenforceable**

Poma previously moved to dismiss Aldora's breach of contract claim on the grounds that the MOU was an unenforceable contract.  In denying Poma's motion to dismiss, the Court accepted the allegations in the Amended Complaint as true (as it must) and relied on two findings: (1) the transition of the lease was not an essential term of the MOU, and (2) even if the transition of the lease was an essential term, the parties reached an agreement on that term.[89]  These preliminary findings at the motion to dismiss stage, however, are not supported by the undisputed evidence from discovery.

A.   **The Transition Of The Lease Was An Essential Term Of The MOU**

The R&R stated that the parties "agreed on the essential terms of the contract" —"the assets that were to be sold, the price at which the assets were to be sold, and the timeframe for the sale."[90]  That statement is now belied by the undisputed evidence.

To conclude that the only essential terms of the MOU were those related to the equipment assumes that the MOU was solely a contract for the purchase of equipment.  As discussed above, it plainly was not.  The transition of the lease was an essential term of the MOU.[91]  Without repeating all of the evidence above, it is sufficient to note that the undisputed evidence shows that neither Poma nor Aldora would have entered into the MOU if it was just an asset sale; both parties required that the lease be transitioned.[92]

---

[89]   *See* Report and Recommendation ("R&R"), Dkt. No. 30 at 8.
[90]   R&R, at 8.
[91]   *See supra* Section I(A).
[92]   Aldora was not simply "going to buy the equipment assets and not end up operating and leasing the building."  Silverstein Depo at 150:10-16; *see also id.* at 100:10-101:12 (acquiring the Jacksonville facility was

### B.    The Parties Never Agreed On The Terms Of The Transition Of The Lease

The R&R also stated that even if the transition of the lease was an essential term, the parties reached an agreement on that term.   According to the R&R, the "acceptable agreements" to transition the lease "were not within the parties' power to negotiate between themselves, but required negotiation with the landlord."[93]  In other words, the R&R concluded that by agreeing to each work out an "acceptable agreement" with the Landlord, Poma and Aldora had necessarily reached an agreement with each other on the transition of the lease.[94] And the reason that the R&R concluded that agreeing to work out "acceptable agreements" was an agreement in itself was because (1) Aldora's agreement with the Landlord and Poma's agreement with the Landlord were purportedly "independent" and (2) there was nothing left for Poma and Aldora to further negotiate with one another.[95]   But the undisputed evidence proves just the opposite – the two agreements with the Landlord were inextricably linked to one another and that, as a result, the terms of the agreements for the transition of the Jacksonville facility were subject to future negotiation between the parties.

### 1.    The Parties Agreements With The Landlord Were Dependent On Each Other

First, the evidence establishes that Aldora and Poma could not independently work out acceptable agreements with the Landlord because Poma's agreement with the Landlord on the early termination of its lease and Aldora's agreement with the Landlord on a new lease were entirely dependent on one another.  The dependent nature of the two agreements is reflected in

---

"integral" to the transaction as Aldora "weren't going to just buy the equipment without getting into the facility"). Similarly, "selling just the equipment is not why [Poma] made this proposed deal."  Exhibit 27.

[93]      R&R at 8.
[94]      *Id.*
[95]      *Id.*

the very structure of the negotiations themselves.  As Mr. Silverstein testified, Poma would have to negotiate first, and Aldora second, because "whatever [Poma] worked out with [the Landlord] was obviously going to affect [Aldora]."[96]  This was the reason that Aldora decided to remain on the "sidelines" while Poma negotiated its early termination agreement.[97]  Aldora was also aware that the lease concessions it demanded from the Landlord would directly affect the payment terms that the Landlord ultimately demanded from Poma as part of the early termination agreement.[98]  It was for this reason that Aldora provided its proposed lease terms to the Landlord so that the Landlord could build them into the "model" that it planned to use in negotiations with Poma.[99]  Had the parties' agreements with the Landlord been truly independent, Poma and Aldora could have simultaneously and "individually" negotiated agreements with the Landlord.  In that instance, the Landlord could have reached an agreement with Poma without regard to the lease concessions demanded by Aldora and vice versa.  But this did not happen because it could not happen given that the parties' agreements with the Landlord were dependent on one another.

### 2.   The Terms Of The Lease Transition Were Within The Parties' Power To Negotiate

Second, given the interdependence of the two agreements with the Landlord, the lease terms were "within the parties' power to negotiate" despite the R&R's statement to the contrary.  This is because in order to agree to the free rent and tenant improvement allowance demands by <u>Aldora</u>, the Landlord was going to have to recoup at least some of those costs

---

[96]   Silverstein Depo at 391:4-15.
[97]   *Id.* at 274:22-275:5.
[98]   *Id.* at 242:3-243:4.
[99]   Exhibit 9 at 2.

from Poma.[100] In other words, the more money in free rent and tenant improvement allowances that Aldora demanded from the Landlord, the more the Landlord demanded from Poma to terminate the lease. Conversely, the more Poma was willing to pay the Landlord to terminate the lease, the more in free rent and tenant improvement allowances the Landlord was willing to provide Aldora. The Landlord admitted as much by testifying that as a "starting point" for his negotiations with Poma, he was going to "have to be made whole" for the lease concessions he was going to provide to Aldora.[101] Thus, although not negotiating directly with one another, the parties necessarily had to agree on the terms of the lease transition – either Poma would have to agree to fund some or all of the lease concession demanded by Aldora or Aldora would have to forgo (or at lease reduce) those demands.

The parties' communications in October and November of 2014 illustrate this point. Poma repeatedly told the Landlord that, despite not knowing the specific nature of Aldora's demands, it was unwilling to fund Aldora's lease concessions. Specifically, on September 16, 2014, Poma told the Landlord that it was "not willing to pay additional funds to terminate the lease assuming Aldora takes over as the new tenant . . .".[102] On October 29, 2014, Poma told the Landlord that "for things like free rent and capital contributions up front, those are costs you will get back [from Aldora] over the life of the new lease, so [Poma does] not agree at all . . . to pay you up front for something you will get back anyways."[103] Poma made the same statements to Aldora. From the very beginning, Poma told Aldora that the Landlord wanted

---

[100]     Silverstein Depo at 81:2-11.
[101]     Mac Easton Deposition dated December 8, 2015, attached hereto as Exhibit 7 ("Easton Depo") at 259:23-260:15.
[102]     Exhibit 18 at 1.
[103]     Exhibit 24 at 2.

"a lot more money from [Poma] to terminate [the] lease early than [Poma was] willing to pay."[104] And Aldora was aware that the reason the Landlord was demanding more from Poma was because the Landlord needed Poma to fund Aldora's lease concessions.[105]

If Aldora had demanded less from the Landlord in lease concessions, Poma and the Landlord could have worked out an "acceptable agreement" to transition the lease. Similarly, had Poma been willing to pay more as an early termination fee, Aldora and the Landlord could have reached an "acceptable agreement" on a new lease. The parties were unable to do this because they never agreed on what Poma would pay the Landlord or what Aldora would demand from the Landlord. Thus, there was no agreement on an essential term of the MOU.

### 3. An Agreement To Work Out Acceptable Agreements With A Third Party Landlord Is Too Vague And Uncertain

Third, the conclusion in the R&R that a purported agreement to work out a future "acceptable agreement" with a third party was sufficiently certain to constitute an enforceable agreement is not supported by Florida law or the evidence. *See John Alden Life Ins. Co.*, 675 So.2d at 189 n.1 (contract stating that "separate bonus payment will be negotiated" held unenforceable as an "agreement to agree"); *Spanish Broad. Sys. of Fla., Inc.*, 689 So.2d at 1094 (contract leaving duration of employment "subject to further negotiation by the parties" held unenforceable). As the Florida Supreme Court recognized, "if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *David*, 568 So.2d at 924. An agreement for Poma and Aldora to work out an "acceptable agreement" with the Landlord is, by its very nature, too vague and uncertain to

---

[104]    Exhibit 19 at 1.
[105]    Silverstein Depo at 81:2-11; 85:14-20.

provide any basis to determine whether it has been kept or broken. Given that only the parties themselves knew the terms that they would consider "acceptable"– and never discussed them prior to signing the MOU – there is no way for a court or jury to decide whether the agreement was kept or broken, without holding the party to terms that it never agreed to in the MOU.[106] Thus, the MOU is unenforceable.[107]

III.     **In the Alternative, Even If The MOU Was An Enforceable Contract, Poma Is Entitled To Summary Judgment Because Aldora Failed To Satisfy A Condition Precedent Of The Contract**

To the extent this Court concludes that the MOU was an enforceable agreement, Aldora's breach of contract claim still fails as a matter of law because (1) Section 5.b was a condition precedent to the MOU and (2) regardless of Poma's negotiations with the Landlord, Aldora failed to satisfy that condition precedent by working out an "acceptable agreement" with the Landlord for a lease of the Jacksonville facility.

Section 5.b is a condition precedent of the MOU. Under Florida law, provisions of a contract will be considered conditions precedent where the express wording employs conditional language. *See Gunderson v. Sch. Dist. Of Hillsborough Cnty.*, 937 So.2d 777, 779

---

[106]     For example, Poma testified that it was never willing to pay more than its $96,658.50 offer it made to the Landlord on October 21, 2014. Antonucci Depo at 137:14-21. Outside of the standard of whether this was an "acceptable agreement" for Poma, there is no basis upon which to determine whether Poma kept or broke any agreement to work out an acceptable agreement with the Landlord.

[107]     The R&R's statement that "Florida courts have recognized similar contracts as enforceable, despite a condition that requires negotiation with and/or approval by some third party" is not supported by the cases cited in support of the statement. Neither *Windowmaster Corp. v. Jefferson Constr. Co.*, 114 So.2d 626 (Fla. 3rd DCA 1959) nor *Hamilton v. Title Ins. Agency of Tampa, Inc.*, 338 So.2d 569 (Fla. 2d DCA 1976) involved future agreements to be negotiated with third parties, much less the future negotiation of commercial lease-related agreements with a third party. Instead, both cases required the future performance of ministerial or perfunctory tasks, such that the court could easily determine "whether the agreement has been kept or broken." *See Windowmaster*, 114 So.2d at 628 (requiring that products be "approved" by third party); *Hamilton*, 338 So.2d at 570 (requiring building permits be issued by third party). The open terms of the future agreements for the transition of the Jacksonville lease are not analogous to a third party "approval" of a previously-negotiated contract term in *Windowmaster* and *Hamilton*.

(Fla. 1st DCA 2006).  There is no dispute that Section 5 of the MOU employs conditional language.  It provides that the sale of the equipment was "subject to the following conditions," including "Poma and Aldora individually working out acceptable agreements to transition the Jacksonville Site and provide a lease thereof to Aldora and to allow Poma to exit the facility with the landlord for that site prior to the closing."[108]

It is also undisputed that Aldora failed to satisfy that condition precedent.  *See S. Internet Sys., Inc. ex rel. Menotte v. Pritula*, 856 So.2d at 1125, 1128 (Fla. 4th DCA 2003) (finding that because condition precedent was never satisfied, no contract was ever formed between the parties)).  To satisfy section 5.b, <u>both</u> parties were required to work out "acceptable agreements" to transition the Jacksonville facility.  In the case of Aldora, it was required to come to an agreement with the Landlord on the terms of a lease.  But Aldora and the Landlord never agreed on the terms of a lease prior to the expiration of the MOU.  Specifically, Silverstein stated:

> Q.    So you hadn't agreed with Mac specifically on how much free rent you
>        would get as of November 6th; right?
> **A.    Correct.**
> Q.    And you hadn't agreed on how much in tenant improvements you would
>        get from Mac as of November 6th; right?
> A.    **Correct.**[109]

Similarly, the Landlord confirmed that he never agreed on the terms of a lease with Aldora.[110] Therefore, regardless of whether Poma reached an acceptable agreement with the Landlord, Aldora failed to satisfy a condition precedent to the MOU and therefore there can be no

---

[108]   *See* Exhibit 14 at 3.
[109]   Silverstein Depo at 460:5-12.
[110]   Easton Depo at 177:17-19; Silverstein Depo at 155:2-10.

contract.[111]  *S. Internet Sys., Inc.*, 856 So.2d at 1128 (no contract formed because of failure of condition precedent).

## IV.   Aldora Cannot Establish that Poma Breached the Covenant of Good Faith and Fair Dealing

Aldora also asserts a claim for breach of the implied covenant of good faith and fair dealing.  The basis of this claim is that Poma breached the covenant by not negotiating with the Landlord in good faith.  Aldora's claim fails as a matter of law for two alternative reasons. First, if this Court concludes that Aldora's breach of contract claim fails, it must necessarily find that Aldora's breach of the covenant of good faith and fair dealing claim also fails. Second, even if Aldora can independently maintain a claim for breach of the implied covenant, there is no basis for a jury to determine whether Poma negotiated in good faith.

### A.   If there is no valid contract, Aldora's breach of the covenant of good faith and fair dealing must also fail as a matter of law

Florida law recognizes an implied covenant of good faith and fair dealing in every contract.  *S. Internet Sys., Inc.*, 856 So.2d at 1125.  Nevertheless, the Eleventh Circuit has held that "a claim for a breach of implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Centurion Air Cargo, Inc. v. United Parcel Svc. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005)

---

[111]   Aldora's argument at the motion to dismiss stage that it was Poma's conduct that prevented Aldora from satisfying a condition precedent to the contract effectively proves Poma's first argument that the parties' agreements with the Landlord were dependent on one another and thus there was no agreement on an essential term of the MOU.  *See* Dkt. No. 15 at 8.  Any argument by Aldora that its ability to reach an agreement with the Landlord was dependent on Poma reaching an agreement with the Landlord for an early termination (such that Poma's failure to reach an agreement prevented Aldora from reaching an agreement) necessarily concedes that the two agreements were dependent on one another.  If this Court concludes that the two agreements were dependent, it should also conclude that it was impossible for the parties to independently negotiate "acceptable agreements" with the Landlord to transition the lease of the Jacksonville facility.  Therefore, those negotiations were instead subject to further negotiation between the parties, and thus the parties did not agree on an essential term of the MOU rendering it unenforceable.

(implied covenant claim failed because defendant did not breach the express terms of contract).

This is because a breach of the implied covenant is not an independent cause of action, but

attaches instead to the performance of a specific contractual obligation. *Id.*; *Snow v. Ruden,*

*McClosky, Smith, Schuster & Russell, P.A.,* 896 So.2d 787, 792 (Fla. 2d DCA 2005)

(dismissing implied covenant claim because complaint did not link implied covenant of good

faith to a breach of an express provision of contract). Aldora's breach of the implied covenant

of good faith and fair dealing claim fails as a matter of law because, as discussed above, there

is no enforceable contract between Aldora and Poma, and necessarily no breach of an express

term of an enforceable contract.

**B.      Even if the MOU is an Enforceable Agreement, Aldora's Breach of the Covenant of Good Faith and Fair Dealing Claim Still Fails**

To the extent this Court concludes that the MOU is an enforceable agreement, Aldora's

claim still fails because Aldora cannot identify a specific contractual provision that has been

breached and thus cannot establish that Poma failed to negotiate in good faith. "[T]he implied

covenant  of good faith and fair dealing is  designed  to  protect  the  contracting  parties'

reasonable expectations." *Cox v. CSX Intermodal, Inc.,* 732 So.2d 1092, 1097 (Fla. 1st DCA

1999). A claim for breach of the implied covenant of good faith and fair dealing thus cannot

be maintained without identifying express contractual provisions that have been breached.

*Moran v. Crystal Beach Capital, LLC,* 8:10-cv-1037, 2011 WL 17637 (M.D. Fla. 2011).

Aldora alleges that, pursuant to Section 5.b, Poma was "obligated . . . to negotiate with

the [Landlord] in good faith to reach an agreement" to transition its lease and that Poma's

failure to do so constitutes a breach of the covenant of good faith and fair dealing.[112]   What this argument ignores, however, is that because Poma and Aldora never agreed on the terms of the "acceptable agreements," there is no "express provision" in the MOU against which a jury can determine whether Poma acted in good faith.   In order for a jury to determine whether Poma's offer to pay the Landlord $96,658.50 was made in good faith, it must implicitly hold Poma to a specific termination fee amount that Poma never agreed to in the MOU or otherwise. Poma never said that it was willing to pay $100,000, $200,000, $300,000, or even $400,000 for the early termination of its lease.  It never agreed to a specific termination fee of any kind. Yet, for a jury to determine that Poma breached (or satisfied) the covenant of good faith and fair dealing, the jury must conclude that a specific fee amount – whether it be $50,000 or $500,000 – met the good faith standard.  Therefore, Aldora's implied covenant claim fails as a matter of law because Aldora cannot identify any express contractual provision that was breached. *Moran*, 2011 WL 17637 at *3.

In the alternative, the Court should grant summary judgment on the implied covenant claim because Aldora stated that the Landlord ultimately accepted Poma's $96,658 offer to terminate the lease early, albeit after the expiration of the MOU.[113]   Evidence that the Landlord accepted Poma's prior offer should conclusively establish that Poma satisfied any implied covenant of good faith and fair dealing.

---

[112]   Am. Compl. ¶ 36
[113]   Exhibit 31 at 1.

**V.     Aldora's Promissory Estoppel Claim Fails Because There Was No Agreement on the Future Acceptable Agreement**

For the same reasons that Aldora's breach of contract claim fails, the claim for promissory estoppel also fails. "To state a cause of action for promissory estoppel under Florida law, the plaintiff is required to allege three elements: (1) a promise as to a material fact that is contrary to a later-asserted position; (2) a reasonable reliance on that promise; and (3) a change in position detrimental to the party claiming estoppel caused by the promise and reliance thereon." *FCCI Ins. Co. v. Cayce's Excavation, Inc.,* 901 So.2d 248, 251 (Fla. 2d DCA 2005); *see also W.R. Grace & Co. v. Geodata Servs., Inc.,* 547 So.2d 919, 924 (Fla. 1989) (quoting Restatement (Second) of Contracts § 90 (1979)).

Here, there was no discussion, much less agreement, on the terms of the "acceptable agreements" and thus the alleged "promise" contained in Paragraph 5.b is too indefinite to support the claim. Florida courts have held that for a promise to be binding it must be "definite, of a substantial nature, and established by clear and convincing evidence." *Eclipse Med. Inc. v. Am. Hydro-Surgical Instruments, Inc.,* 262 F. Supp. 2d 1334, 1350 (S.D. Fla. 1999) (citing *W.R. Grace & Co.,* 547 So.2d at 920); *see also Hygema v. Markley,* 137 Fla. 1, 19, 187 So. 373, 380 (1939) (rejecting promissory estoppel claim because the promise "was not definite but, on the contrary, was entirely indefinite as to terms and time."). As discussed above, it is undisputed that Aldora and Poma never reached any agreement on the terms of the "acceptable agreements" for the transition of the lease.[114] Poma never discussed what it would be willing to pay for the early termination of the lease and Aldora never discussed what it would consider

---

[114]     Silverstein Depo at 230:16-231:1.

acceptable terms of a new lease with the Landlord.[115]  Poma cannot be held to a "promise" that it would reach an "acceptable agreement" with the Landlord when the parties never discussed the terms of those "acceptable agreements" prior to the execution of the MOU.  A promise to work out an "acceptable agreement" is simply too indefinite to support a promissory estoppel claim and thus that claim fails as a matter of law.

For the same reasons, Aldora cannot establish that its reliance on any such promise to "work[] out acceptable agreements" was reasonable given that the promise was unenforceable. *Bankers Trust Co. v. Basciano*, 960 So.2d 773, 778 (Fla. 5th DCA 2007) ("A party cannot rely to his detriment on an unenforceable promise.").  "The Florida Supreme Court is loathe to find justified reliance on a promise lacking a 'definite and substantial character in relation to the remedy sought.'" *Eclipse Med. Inc.* 262 F. Supp. 2d at 1351 (citing *W.R. Grace,* 547 So.2d at 924).  Because the terms of a purported promise to "work[] out acceptable agreements" were not only indefinite but also non-existent, there is no genuine issue of disputed fact  Aldora's reliance on such an alleged promise was reasonable.

## VI.    Aldora Is Not Entitled to Specific Performance

To the extent this Court finds that Aldora's claims survive summary judgment, the Court should also still conclude that Aldora is not entitled to specific performance.  Specific performance is an appropriate remedy only when there is no adequate remedy at law. *Castigliano v. O'Connor,* 911 So.2d 145, 148 (Fla. 3d DCA 2005).   Moreover, Florida law recognizes the right to enforce specifically a contract only for the sale of real property or for such personal property that is of a unique character and value. *Clements v. Leonard,* 70

---

[115]    *Id.* at 180:14-18; 181:12-19; 224:23-225:2; 225:3-8.

So.2d 840, 842 (Fla.1954); *Mangus v. Porter,* 276 So.2d 250 (Fla. 3d DCA 1973).   Here, Aldora is not entitled to specific performance because it has an adequate remedy at law as evidenced by its expert report which quantifies each of its alleged elements of damages.[116] Additionally, the equipment at issue was not unique as Mr. Silverstein testified that Aldora has purchased several items of replacement equipment.[117]   Lastly, the MOU involved both the sale of equipment and the transition of a lease requiring negotiation of acceptable terms of an agreement with the Landlord.   Given the required agreement with the Landlord, there is no practical way to specifically perform the MOU at this point (and Aldora has already decided to operate a facility in Orlando, rather than Jacksonville).[118]

## CONCLUSION

Based on the foregoing, Poma respectfully requests that the Court enter judgment in its favor, and against Aldora, on the breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel claims set forth in Aldora's Complaint.

Respectfully submitted this 15th day of March, 2016.

Christopher A. Riley
Florida Bar Number 0168165
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
(404) 881-7777 (facsimile)
chris.riley@alston.com

Attorney for Defendant

---

[116]   *See* Poma's Motion to Exclude Testimony of G. Hartley Mellish, at Exhibit A (expert report), filed contemporaneously herewith, wherein Aldora sets forth specific dollar figures for all elements of damages.
[117]   Silverstein Depo (Day 2) at 96:10-12; 103:9-13; 107:3-7; 120:2-7.
[118]   Silverstein Depo at 33:3-11.

## CERTIFICATE OF SERVICE

This is to certify that on March 15, 2016, I served the following *Poma's Motion for*

*Summary Judgment* via U.P.S. on the following individuals:

George M. Vinci
Neal Troum
Spector Gadon & Rosen, P.C.
1635 Market Street, Floor 7
Philadelphia, Pennsylvania 19103

Christopher A. Riley
Florida Bar Number 0168165
chris.riley@alston.com

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALDORA ALUMINUM              )
GLASS PRODUCTS, INC.,        )
                                  )
                                  )   **CIVIL ACTION**
          Plaintiff,       )
v.                              )   **Case No. 3:14-CV-1402-J-34JBT**
                                  )
POMA GLASS & SPECIALTY      )
WINDOWS, INC.,              )
                                  )
          Defendant.    )
                                  )

## INDEX OF EXHIBITS CITED IN POMA'S MOTION FOR SUMMARY JUDGMENT

| Exhibit | Description |
|---------|-------------|
| 1 | August 25, 2015 Deposition of Michael Antonucci |
| 2 | October 26, 2015 Deposition of Christopher Correnti |
| 3 | October 30, 2015 Deposition of Paul Schmitz |
| 4 | November 16, 2015 Deposition of Stephen d'Incelli |
| 5 | December 3, 2015 Deposition of Leon Silverstein |
| 6 | December 4, 2015 Deposition of Leon Silverstein |
| 7 | December 8, 2015 Deposition of Mac Easton |
| 8 | August 19, 2014 Email from L. Silverstein to C. Correnti |
| 9 | August 27, 2014 Email from L. Silverstein to M. Easton |
| 10 | November 1, 1993 Lease Agreement |
| 11 | April 10, 2014 Email from L. Silverstein to C. Correnti |
| 12 | August 25, 2014 Email from L. Silverstein to C. Correnti |
| 13 | August 30, 2014 Email from L. Silverstein to S. Hauncher |
| 14 | September 5, 2014 Email from C. Correnti to L. Silverstein |
| 15 | October 31, 2014 Email from C. Correnti to L. Silverstein |
| 16 | September 16, 2014 Email from L. Silverstein to C. Correnti |
| 17 | October 7, 2014 Email from L. Silverstein to C. Correnti |
| 18 | September 16, 2014 Email from C. Correnti to M. Easton |
| 19 | September 17, 2014 Email from L. Silverstein to S. Hauncher |

| Exhibit | Description |
|---------|-------------|
| 20 | September 30, 2014 Email from M. Easton to C. Correnti |
| 21 | October 22, 2014 Email from C. Correnti to M. Easton |
| 22 | October 29, 2014 Email from M. Easton to C. Correnti |
| 23 | October 29, 2014 Email from M. Easton to C. Correnti |
| 24 | October 29, 2014 Email from C. Correnti to M. Easton |
| 25 | November 4, 2014 Email from M. Easton to C. Correnti |
| 26 | October 29, 2014 Email from C. Correnti to L. Silverstein |
| 27 | November 7, 2014 Email from C. Correnti to L. Silverstein |
| 28 | November 5, 2014 Email from C. Correnti to M. Easton |
| 29 | September 28, 2014 Email from L. Silverstein to M. Easton |
| 30 | November 12, 2014 Email from M. Antonucci to C. Correnti |
| 31 | November 14, 2014 Email from S. Hauncher to M. Antonucci |
| 32 | October 2, 2014 Letter of Intent |
| 33 | October 29, 2014 Email from M. Antonucci to A. Wolfe |
| 34 | August 26, 2014 Email from L. Silverstein to S. Hauncher |