UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ALDORA ALUMINUM &
GLASS PRODUCTS, INC.,

        Plaintiff,

v.                                CASE NO.  3:14-cv-1402-J-34JBT

POMA GLASS & SPECIALTY
WINDOWS, INC.,

        Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion for Summary

Judgment ("Motion") (Doc. 96) and Plaintiff's Response thereto (Doc. 107).  The

Motion was referred to the undersigned for a report and recommendation regarding

an appropriate resolution.  (Doc. 108.)  For the reasons set forth herein, the

undersigned respectfully **RECOMMENDS** that the Motion be **GRANTED** and that

final summary judgment be entered against Plaintiff Aldora Aluminum & Glass

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2).  "A party may respond to another party's objections within 14 days after being served with a copy." *Id.*  A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made. *See* Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

Products, Inc. ("Aldora") and in favor of Defendant Poma Glass & Specialty Windows, Inc. ("Poma").[2]

## I. Summary of Recommendation

The undersigned recommends that the alleged contract in this case, when considered in factual context and not just in light of the allegations of the complaint, is an unenforceable agreement to agree because it left essential terms and conditions of the contract, i.e., transition of the site, open to future negotiations with the landlord. Because there is no enforceable contract, Aldora's implied covenant of good faith and fair dealing claim must fail. Similarly, because Poma did not make a definite or unconditional promise to Aldora, the promissory estoppel claim must also fail. Accordingly, the undersigned recommends that the Motion be granted.

## II. Facts Not Genuinely in Dispute

Even viewed in the light most favorable to Aldora, the facts not genuinely in dispute reveal the following. Poma operated several glass fabrication facilities, including one located in Jacksonville, Florida. (Doc. 96-2, Christopher Correnti Deposition, "Correnti Depo," at 34:13–16.)[3] In 2014, Poma decided to shut down

---

[2] The undersigned will also recommend that Poma's Motion for Leave to File Reply Briefs in Support of Motion for Summary Judgment, *Daubert* Motion, and Motion to Strike Specific Performance Relief ("Reply Motion") (Doc. 111) and Poma's Motion for Oral Argument on Its Motion for Summary Judgment ("Oral Argument Motion") (Doc. 94) be denied as unnecessary.

[3] All citations to deposition transcripts refer to the pagination on the transcripts themselves rather than the header page numbers as supplied by CM/ECF.

its Jacksonville facility.  (*Id.* at 49:5–10.)  In the summer of 2014, Aldora, which also operates glass fabrication facilities, spoke with Poma's landlord at the Jacksonville facility, William "Mac" Easton of 6600 Suemac Place LLC, about leasing the facility.  (*See* Doc. 96-5–96-6, Leon Silverstein Deposition, "Silverstein Depo," at 54–55; Doc. 96-10 at 3.)  Aldora was also interested in purchasing some of Poma's equipment located at the Jacksonville facility.  Leon Silverstein, Aldora's CEO, began negotiating a deal to purchase the equipment with Christopher Correnti, a vice president and secretary of Poma.  (Silverstein Depo at 55.)

On September 4, 2014, the parties executed a document entitled "Memorandum of Understanding" ("MOU") whereby Poma "agree[d] to sell to Aldora and Aldora agree[d] to purchase" certain assets located at the Jacksonville facility "for a total purchase price of USD$825,000."  (Doc. 107-1 at 2.)  Although the MOU stated that it was "legally binding on the parties," it also stated that the sale was subject to, among other things, "Poma and Aldora individually working out acceptable agreements to transition the Jacksonville Site and provide a lease thereof to Aldora and to allow Poma to exit the facility with the landlord for that site prior to the Closing."  (*Id.* at 2–3.)  The parties did not discuss the terms of what each might consider to be "acceptable agreements" to transition the Jacksonville facility.  (Silverstein Depo at 180:14–18, 225:3–8, 230:16–231:1.)  The deadline for the closing was initially set for October 31, 2014 (Doc. 107-1 at 2), but was later extended to November 7, 2014 (Doc. 96-17 at 2–3).

Mr. Silverstein testified in deposition that he "would not have even pursued the MOU if [he] didn't think [he] could get a lease with [Mr. Easton]."  (Silverstein Depo at 152:6–8.)  Aldora was not "going to buy the equipment assets and not end up operating and leasing the building."  (*Id.* at 150:14–16.)  In an email to Mr. Silverstein, Mr. Correnti stated, "[s]elling just the equipment is not why we made this proposed deal.  It had to accomplish all our purposes or we would just use the equipment at our other remaining sites and work on the lease mitigation in other ways either ourselves or together with [Mr. Easton]."  (Doc. 96-29 at 2.)

Prior to the execution of the MOU, Mr. Silverstein had emailed Mr. Easton his proposed terms for a lease between Aldora and 6600 Suemac Place LLC. (Doc. 96-11.)  The proposed lease terms included a $150,000 tenant improvement allowance, six months free rent, and a ten year lease term.  (*Id.* at 2–3.)  The email stated: "You can build these costs into whatever model you need to make in an early termination deal with [Poma] if we get that far."  (*Id.* at 3.)

On September 16, 2014, following execution of the MOU, Mr. Correnti sent Mr. Easton an email regarding Poma's proposal to terminate its lease.  (Doc. 96-20.)  At the time, Poma had about 18 months remaining on the lease and was paying about $28,000 per month in rent.  (Doc. 96-12 at 33; Doc. 96-32 at 2.)  Mr. Correnti's email stated that Poma agreed to pay $38,000 to replace copper wire that had been stolen from the Jacksonville facility, that Poma was still considering cost estimates for other repairs it needed to make prior to vacating the facility, and that Poma was "not willing to pay additional funds to terminate the lease."  (Doc.

96-20 at 2.)  Mr. Correnti pointed out that Aldora was "going to lease for a minimum of 5 years and given the equipment they will have there, . . . they will not easily pick up and leave that location." (*Id.*)  Mr. Correnti also noted that Poma was "selling equipment to Aldora at significantly reduced prices . . . in an effort to facilitate an immediate tenant for [the Jacksonville facility] and expedite the transition." (*Id.*)  Mr. Correnti suggested that Mr. Easton "firm up [his] lease requirements and terms with Aldora." (*Id.*)  Mr. Correnti noted that Poma was "not willing to guarantee or underwrite Aldora's lease." (*Id.*)  On September 30, 2014, Mr. Easton emailed a response which stated in part, "Your response to my initial efforts to help offset your current rent liabilities have sorta tied my hands."  (Doc. 107-12 at 3.)

On October 21, 2014, Mr. Correnti again emailed Mr. Easton and stated that Poma was willing to pay $38,658.50 to replace the copper wire, $31,000 to resolve insurance claim issues, and $27,000 for "a complete buy-out of the lease rental obligations remaining," a total of $96,658.50.  (Doc. 107-12 at 2.)  Mr. Easton responded that the offer was "basically a non-starte[r]" for him.  (Doc. 107-13 at 2.)  Mr. Easton instead suggested a "buy out number" of $500,000.  (Doc. 107-14 at 3.)  Mr. Easton and Mr. Correnti did not reach agreement by the November 7, 2014 deadline.

On November 12, 2014, after the deadline had expired, Scott Hauncher, a member of Aldora's board, emailed Michael Antonucci, the president of Poma, to "lay out the facts as [Mr. Easton] understands them because there seems to be a

disconnect on what the true obligations to AGC [Poma's parent company] would be under the existing lease." (Doc. 96-32 at 2.)  Mr. Hauncher stated, "there appears to be a $400,000 difference between the $100,000 settlement amount AGC proposes, and the $500,000 [p]roposed by [Mr. Easton].  Aldora is willing to bridge some of this gap, and we have already discussed reducing some of the rent and buildout concessions in our lease with [Mr. Easton]." (*Id.*)  On November 14, 2014, Mr. Hauncher emailed Mr. Antonucci to tell him that he and Mr. Easton had come to agreement on lease terms and that Mr. Easton would accept a buyout of $98,658 from Poma, almost the same amount Poma offered on October 21, 2014.[4] (Doc. 96-33 at 2.)  Aldora had agreed to "pick up the difference of the delta between what . . . [Mr. Easton] was going to get from [Poma], and the $500,000 [Mr. Easton asked for]." (Docs. 96-7–96-8, Leon Silverstein Deposition – Day 2, "Silverstein Depo 2," at 51:17–20.)  However, at that point the deadline had passed and Mr. Antonucci did not come to an agreement with Mr. Hauncher. (*See* Doc. 96-1, Michael Antonucci Deposition, "Antonucci Depo," at 237–38.)

Around the same time in 2014, AGC was negotiating a sale of its North American commercial glass fabrication facilities to Trulite Glass & Aluminum Solutions ("Trulite").  On October 27, 2014, representatives of Sun Capital Partners, Inc. ("Sun Capital"), Trulite's parent company, expressed to Poma representatives that it expected the Jacksonville facility at issue in the Aldora

---

[4] It appears that the $2,000 difference may actually be a typographical error.  In an attachment to his email, Mr. Hauncher refers to the $96,658 amount.  (Doc. 96-33 at 4.)

negotiations to be sold to Trulite as part of the larger sale of facilities.  (Antonucci Depo at 33:16–34:11.)  On October 29, 2014, still within the MOU deadline, Mr. Antonucci emailed Aaron Wolfe, a managing director at Sun Capital, and stated "Chris [Correnti] is still working on potential angles from AGC perspective to kill JAX deal [with Aldora]."  (Doc. 96-35 at 2.)  On November 3, 2014, Mr. Wolfe sent an email regarding the Jacksonville facility to Paul Schmitz, the CEO and president of Trulite, and Stephen d'Incelli, a vice president of Sun Capital, stating, in part, "We get all equipment in Jacksonville. . . . [W]e assume lease."  Mr. d'Incelli asked "Is this final and officially agreed to," and Mr. Wolfe responded "Yes."  (Doc. 107-9.)  Eventually, AGC and Trulite reached a final agreement with regard to the Jacksonville equipment.  (*See* Antonucci Depo at 230:14–18.)

### III.   Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th

Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV.    Analysis

In its Amended Complaint, Aldora alleges that Poma refused to sell the assets, and failed to work out an agreement with its landlord. (Doc. 5 at 4.) Aldora also alleges that Poma failed to negotiate in good faith with the landlord and refused to extend closing in order to continue negotiations with the landlord. (*Id.* at 7.) Aldora further alleges that it relied on Poma's promises and suffered pecuniary harm as a result. (*Id.* at 8.) Aldora alleges causes of action for breach of contract ("Count I"), breach of the implied covenant of good faith and fair dealing ("Count II"), and promissory estoppel ("Count III"). (*Id.* at 2–8.)

Poma argues that summary judgment should be granted in its favor because the parties left essential terms of the MOU open and subject to future negotiation, and thus the MOU is unenforceable. Poma argues in the alternative that even if the MOU was an enforceable contract, Aldora itself failed to satisfy a condition precedent of the contract, i.e., Aldora failed to work out an acceptable agreement with Mr. Easton, within the deadline, to transition the Jacksonville facility. Poma also argues that Aldora cannot establish that Poma breached the covenant of good faith and fair dealing, and that Aldora's promissory estoppel claim fails.[5]

The undersigned recommends that, even viewing the evidence in Aldora's favor, the MOU was merely an unenforceable agreement to agree, given that the transition of the facility was an essential part of the transaction and that the parties

---

[5] Poma also argues that Aldora is not entitled to specific performance. The undersigned need not address this argument.

had set no parameters at all about what each might consider "acceptable agreements" regarding the transition.

### A.   Breach of Contract

"An adequately pled breach of contract action requires three elements: (1) a valid contract; (2) a material breach; and (3) damages." *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008) (citing *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. Dist. Ct. App. 2003); *Indus. Med. Publ'g Co. v. Colonial Press of Miami, Inc.*, 181 So. 2d 19, 20 (Fla. Dist. Ct. App. 1965)).[6] "Under Florida law, the question of whether a valid contract exists is a threshold question of law that may be properly decided by the court." *Kolodziej v. Mason*, 774 F.3d 736, 740 (11th Cir. 2014) (citation omitted).   "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citation omitted) (applying Florida law).

---

[6] The MOU provides that "Florida law will govern this sale excluding its conflict of laws provisions." (Doc. 107-1 at 3.)  Furthermore, the parties rely on Florida law in their briefing.  (*See* Docs. 96 & 107.)  In applying Florida substantive law, this Court follows the rulings of the Florida Supreme Court.  *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).  Where the Florida Supreme Court has not spoken, the Court must, as a general matter, follow the decisions of the Florida District Courts of Appeal.  *Id.* (citation omitted).  But the Court "may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise."  *Id.* (citation omitted).

"The creation of a contract requires that there be mutual assent to a certain and definite proposition.  Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 2007) (internal citations and quotation marks omitted).  "If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *David v. Richman*, 568 So. 2d 922, 924 (Fla. 1990) (quoting Restatement (Second) of Contracts § 33 cmt. a (Am. Law Inst. 1981)).  "However, what constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis.  Nevertheless, an 'agreement to agree' is unenforceable as a matter of law." *ABC Liquors, Inc.*, 967 So. 2d at 1056 (internal citations omitted).

### 1.   Transition of the Site Involved Essential Terms and Conditions of the MOU.

When addressing Poma's motion to dismiss, the undersigned previously recommended that:

> the language of the MOU indicates that the parties intended the agreement to be binding on them and agreed on the essential terms of the contract.  The MOU includes the assets that were to be sold, the price at which the assets were to be sold, and the timeframe for the sale.  (*See* Doc. 5-1 at 2.)  The MOU further provides: "This Agreement is legally binding on the parties and their successors and assigns."  (*Id.* at 3.)

(Doc. 30 at 7–8.)   However, at the motion to dismiss stage, the "nature and complexity" of the transaction and the "case specific" facts were not fully revealed. *See ABC Liquors, Inc.*, 967 So. 2d at 1056.  Viewed simply as an asset purchase agreement with conditions that might easily be satisfied, and without sufficient factual context, the MOU could be viewed as enforceable.   However, the undisputed facts reveal that the transaction involved not just a simple asset purchase, but also relatively complex lease transactions.[7]

"Essential terms in contracts of sale vary greatly depending on the nature and complexity of the underlying transactions.  These terms must be expressed with reasonable certainty considering the subject-matter of the agreement, the purposes for which it was entered into, the situation and relation of the parties, and the circumstances under which it was made." *Farrell v. Phillips*, 414 So. 2d 1119, 1120 (Fla. Dist. Ct. App. 1982) (internal citations and quotation marks omitted). Considering the subject matter of the MOU, its purpose, the situation of the parties, and the circumstances under which the MOU was made, the undersigned recommends that the transition of the site involved essential terms and conditions

---

[7] Aldora argues that, pursuant to the parol evidence rule, the Court cannot consider "the testimonial evidence Poma presents to urge the Court to find that the MOU is unenforceable" because the MOU has "unambiguous language."  (Doc. 107 at 15.)  But, "[t]he parol evidence rule presupposes an action involving an existing valid contract that is, a contract in force as a binding obligation."  *Deal Farms, Inc. v. Farm & Ranch Supply, Inc.*, 382 So. 2d 888, 890 (Fla. Dist. Ct. App. 1980).  "If the issue is as to the existence or validity of the alleged contract, the rule, by its very terms, has no application, and extrinsic evidence is admitted to determine that issue, whether such evidence tends to establish the validity or invalidity of the contract in question."  *Id.* (citation omitted).

of the agreement, i.e., Poma's lease termination and Aldora's new lease, that were not expressed with reasonable certainty.

Mr. Silverstein testified that he "would not have even pursued the MOU if [he] didn't think [he] could get a lease with [Mr. Easton]." (Silverstein Depo at 152:6–8.)  Aldora was not "going to buy the equipment assets and not end up operating and leasing the building." (*Id.* at 150:14–16.)  Mr. Correnti stated, "[s]elling just the equipment is not why we made this proposed deal.  It had to accomplish all our purposes or we would just use the equipment at our other remaining sites and work on the lease mitigation in other ways either ourselves or together with [Mr. Easton]." (Doc. 96-29 at 2.)  Even viewed in the light most favorable to Aldora, the record establishes beyond any genuine dispute that the "transition" of the lease involved essential terms and conditions of the MOU.[8]

## 2. The Essential Terms and Conditions Were Too Uncertain to Be Enforceable.

The undersigned further recommends that, even viewing the evidence in the light most favorable to Aldora, the parties left the terms of the lease transition so uncertain that there was no valid and enforceable contract.  In short, there were no parameters at all regarding what each party might consider "acceptable."  Thus, even considering the parties' stated intent that the MOU was "legally binding," the MOU is too uncertain to be enforceable.  "Where the parties have intended to

---

[8] "Transition" of the lease is used in the sense of Poma terminating its lease and Aldora obtaining a new lease.

conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract.  If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *David*, 568 So. 2d at 924 (quoting Restatement (Second) of Contracts § 33 cmt. a (Am. Law Inst. 1981)).  In short, despite their stated intent, the parties left a gaping hole in their agreement, thereby rendering it unenforceable.

Aldora argues that Poma is making the same argument it made in its motion to dismiss with a "new spin" – "its belief that the parties actually could have decided upon the terms of their 'acceptable agreements' with the landlord."  (Doc. 107 at 13.)  Aldora argues: "The parties were not able to spell out the terms of their future agreements with the landlord in the MOU ex ante, the potential for give-and-take in the parties' respective negotiations with the landlord notwithstanding."  (*Id.* at 15.)  "They instead agreed to work out their respective agreements with the landlord in good faith, and they memorialized this aspect of their agreement – essential or not – in the MOU."  (*Id.* at 15.)

Although the parties may not have been able to work out a complete agreement regarding the transition of the lease without the involvement of Mr. Easton, that fact does not make the MOU enforceable.  Perhaps the parties were not in a position to enter into a legally binding asset sale agreement since an essential condition of that sale was the transition of the site, the terms of which were wide open.  To attempt to do so was to try to allow the tail to wag the dog.

The Court need not decide whether some parameters regarding the transition might have made the MOU enforceable because there simply were no such parameters.  The MOU refers only to working out "acceptable agreements" with the landlord, but there is no basis to allow a jury or the Court to determine what constitutes an "acceptable agreement."  The parties left essential conditions open to further negotiation, so there is no enforceable contract.

Moreover, although the further negotiations had to include a third party, in a real sense the parties were still negotiating with each other indirectly, with the landlord in the middle.[9]  Mr. Silverstein's email to Mr. Easton containing his initial proposed lease terms encouraged Mr. Easton to build Aldora's requested costs into an early termination deal with Poma.  Mr. Correnti suggested to Mr. Easton that he negotiate with Aldora with the understanding that Poma was not "willing to guarantee or underwrite Aldora's lease."  (Doc. 96-20 at 2.)  Eventually, Aldora stated it was "willing to bridge some of [the] gap" between Poma and Mr. Easton by "reducing some of the rent and buildout concessions" in their proposed lease terms.  (Doc. 96-32 at 2.)  That was in fact what eventually happened.  (*See* Silverstein Depo 2 at 51:17–20.)  While the parties were not negotiating directly with one another, they were in effect negotiating indirectly, with Mr. Easton as the

---

[9] In his deposition, Mr. Silverstein stated that "we went into this agreement with the idea that the MOU would be a good deal for all three parties, and there were three, indirectly the three parties . . . ."  (Silverstein Depo at 466:3–7.)

intermediary.  In short, essential terms of the transaction involving transition of the lease were left open to future indirect negotiations between the parties.[10]

### 3. Alternative Argument

Alternatively, Poma argues that, by failing to timely work out an "acceptable agreement" with the landlord to transition the Jacksonville facility, Aldora failed to satisfy a condition precedent to the MOU and thus there is no contract.  *See S. Internet Sys., Inc. ex rel. Menotte v. Pritula*, 856 So. 2d 1125, 1128 (Fla. Dist. Ct. App. 2003) ("Therefore, the condition precedent to the formation of a contract was never met.  Hence, no contract was ever fully formed.").  Aldora argues that Poma's lack of good faith negotiation with the landlord prevented Aldora from satisfying this condition.  Because the undersigned recommends that there is no valid and enforceable contract, this argument need not be addressed.

### B. Remaining Claims

### 1. Good Faith and Fair Dealing

The undersigned recommends that because there is no enforceable contract, there can be no breach of the covenant of good faith and fair dealing.

---

[10] The undersigned recommends that no reasonable jury could find that the lease negotiation between Aldora and the landlord was completely independent from the lease negotiation between Poma and the landlord.  However, even assuming that a reasonable jury could so find based, for example, on Mr. Easton's equivocal testimony regarding the relationship ("I don't think the two were related for me.  For some people it may be . . . . I mean, it is related, but it's not crucial to making a deal on one side or the other." (Doc. 96-9, William Easton Deposition, "Easton Depo," at 203:4–5, 204:23–24)), the undersigned's recommendations would still be the same.  The essential condition to work out "acceptable agreements" regarding the transition is too indefinite to allow for enforcement whether the continued negotiations were interdependent or not.

"Florida law does not recognize a claim for breach of good faith and fair dealing unless an enforceable contract exists." *OneSource Facility Servs., Inc. v. Mosbach*, 508 F. Supp. 2d 1115, 1122 n.5 (M.D. Fla. 2007) (citation omitted). "[A] claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005) (citation omitted). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Id.* at 1151 (citation omitted). Accordingly, Aldora's argument, which makes up the bulk of its Response, that Poma never negotiated with Mr. Easton in good faith and, at one point, even intentionally killed the negotiations because it was pursuing a bigger deal with Sun Capital/Trulite, does not address the threshold issue of whether there was an enforceable contract at all. Therefore, even assuming a genuine factual dispute exists on the issue of good faith, there was no enforceable contract and thus the implied covenant of good faith and fair dealing did not attach.

## 2.    Promissory Estoppel

Plaintiff's claim for promissory estoppel fails for a similar reason. The basic elements of promissory estoppel are:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The

> remedy granted for breach may be limited as justice
> requires.

*W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (quoting

Restatement (Second) of Contracts § 90 (Am. Law Inst. 1979)).  "For promissory

estoppel to be applied, the evidence must be clear and convincing.   Additionally,

promissory estoppel does not apply if the terms of the promise are indefinite."

*Vencor Hosps. S., Inc. v. Blue Cross & Blue Shield of R.I.*, 86 F. Supp. 2d 1155,

1165 (S.D. Fla. 2000) (internal citations and quotation marks omitted) (applying

Florida law), *aff'd sub nom*, 284 F.3d 1174 (11th Cir. 2002).

It appears that Aldora relies both on Poma's promise to sell the assets, as

well as Poma's promise to work out an acceptable agreement with the landlord to

transition the site, as the bases for its promissory estoppel claim.  (*See* Doc. 5 at

7–8.)  However, the undersigned recommends that both bases fail as a matter of

law.  The promise in the MOU to sell the assets was explicitly conditioned on the

site transition.  (Doc. 107-1 at 2–3.)  The promise to work out an "acceptable"

agreement regarding transition of the site was too indefinite, for all the reasons

previously discussed.  (*Id.* at 3.)  Even viewing the evidence in the light most

favorable to Aldora, the undisputed facts establish that any reliance by Aldora on

either of these promises was not reasonable as a matter of law, and therefore,

there is no injustice to be avoided.  Thus, the undersigned recommends that this

claim fails.

## V.     Conclusion

For the aforementioned reasons, the undersigned recommends that the Motion be granted and that final judgment be entered in Defendant's favor.

Accordingly, it is respectfully **RECOMMENDED** that:

1.     The Motion (**Doc. 96**) be **GRANTED**.

2.     The Reply Motion (**Doc. 111**) and the Oral Argument Motion (**Doc. 94**) be **DENIED**.

3.     The Clerk of Court be directed to enter final judgment in favor of Defendant, terminate the then-pending motions, and close the file.

**DONE AND ENTERED** at Jacksonville, Florida, on May 16, 2016.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record